**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JEFFREY W. BLETZ,** | : | |
| *personally, and as guardian of* | : | |
| **DJF, and LINDSEY J. BLETZ,** | : | **No. 1:16-cv-00717** |
| **Plaintiffs** | : | |
| | : | **(Judge Kane)** |
| **v.** | : | |
| | : | |
| **JEREMY W. CORRIE,** | : | |
| **Defendant** | : | |

## MEMORANDUM

Before the Court is Defendant Jeremy W. Corrie ("Defendant")'s motion for summary

judgment. (Doc. No. 40.) For the reasons that follow, the Court will grant the motion.

## I.    BACKGROUND

### A.    Factual Background[1]

---

[1] Unless otherwise noted, the facts recited herein are derived from Defendant's statement of
material facts. (Doc. No. 41.) The facts stated in this section are deemed undisputed in all
material respects. Further, in instances where the parties do not appear to genuinely dispute a
fact, but, rather dispute the veracity or import of certain testimony, the Court cites the given
evidence of record directly. Additionally, where a party asserted an improper response to a
factual assertion, the Court has deemed those facts admitted. See Fed. R. Civ. P. 56(e) ("If a
party fails to properly . . . address another party's assertion of fact . . . the [C]ourt
may . . . consider the fact undisputed for purposes of the motion . . . ."); see also L.R. 56.1
("Statements of material fact in support of, or in opposition to, a motion shall include references
to the parts of the record that support the statements.").

In connection with their response to Defendant's statement of facts, Plaintiffs filed an
additional statement of facts (Doc. No. 44), to which Defendant filed a response (Doc. No. 54-1).
As noted by Defendant in his reply brief, the Local Rules of this Court do not authorize a non-
moving party to file a statement of facts in connection with a motion for summary judgment.
(Doc. No. 55 at 7.) The Court agrees with Defendant that Plaintiffs' additional statement of facts
does not comply with Local Rule 56.1, which contemplates only that a party opposing a motion
for summary judgment file a statement of facts "responding to the numbered paragraphs set
forth" in the moving party's statement of facts. See L.R. 56.1. The Court, therefore, will
disregard Plaintiffs' statement in connection with its consideration of Defendant's motion, and
consider only Plaintiffs' numbered responses to Defendant's statement of material facts, pursuant
to Local Rule 56.1. See Sash v. Hogsten, No. 07-0475, 2009 WL 249649, at *2 (M.D. Pa. Feb.
2, 2009) (providing that L.R. 56.1 "does not provide for a non-moving party to file his own
statement of material facts but instructs the nonmoving party how to properly respond to the

Plaintiffs Jeffrey Bletz ("Jeffrey Bletz"), his daughter, Lindsey Bletz ("Lindsey Bletz"), and his minor grandson DJF ("DJF") (collectively referred to herein as "Plaintiffs"), were at their home in Wrightsville, Pennsylvania on May 1, 2014, along with their dog, Ace ("Ace"), a mixed breed Rottweiler-Labrador. (Doc. No. 41 ¶ 1.) Defendant, a Pennsylvania State Trooper, "was a member of the Troop H York Barracks in the patrol unit" on this date. (Id. ¶ 2.) Defendant testified that in his capacity as a Trooper, it was not "uncommon for [him] to be around dogs" (Doc. No. 41 ¶ 3, Doc. No. 42-1 at 15:5), including while on patrol (Doc. No. 41 ¶ 1). While on patrol, Defendant "did not carry dog treats, dog toys, an air horn, a dog snare or catcher pole, dog tranquilizer, or a shield on his person." (Id. ¶ 5.) Further, Defendant stated that he does not recall receiving "formal training on how to handle an aggressive dog." (Id. ¶ 6; Doc. No. 42-1 at 15: 14-16.) Defendant also testified that he "would be hesitant" to apply the Pennsylvania State Police's "use of force policy" to animals because he considered it to be "reserved for contact with another human being" and stated that he did not believe he was ever instructed that the policy would apply to animals. (Doc. No. 41 ¶ 7; Doc. No. 42-1 at 48: 5-18.)[2] In addition, Defendant stated that in his view of the relevant law, when outdoors, a dog must "be restrained, whether it be [through] a fence, a tie, [or] a leash of some sort[]." (Doc. No. 42-1 at 42: 17-21.)

---

movant's statement of material facts"); Dreibelbis v. Young, No. 06-2055, 2007 WL 4344120, at *2 (M.D. Pa. Dec. 10, 2007) ("[B]ased on the plain language of Local Rule 56.1, Plaintiff's filing of his own Motion and Statement of Material Facts is not technically sufficient to either oppose Defendants' Motion or deny Defendants' Statement of Material Facts.").

[2] The Pennsylvania State Police's "use of force policy," in sum, authorizes members of the state police and officers "to use reasonable force when necessary in the performance of their duties after consideration of the totality of the circumstances to successfully attain law enforcement objectives." (Doc. No. 42-1 at 86.) As it pertains to the "destruction of animals," the policy provides, inter alia, that "[e]nforcement officers who are trained and authorized to carry firearms may use a firearm to kill a dangerous animal in self-defense or defense of another person." (Id. at 92, § 3.06(G)(2).)

Defendant "was assigned to assist with the service of a warrant with other law enforcement agencies at the Bletz home" on May 1, 2014. (Id. ¶ 9.) Prior to arriving at the home, Defendant "met other law enforcement officials about a half mile from the Bletz home for a 'briefing'" before executing the warrant (id. ¶ 10), and Defendant testified that he was unsure whether, at this briefing, there was any discussion "about how any dog would be handled if encountered during the warrant service" (Doc. No. 42-1 at 29: 18-21). Defendant's role in executing the warrant "was to assist an officer at the front door and to eventually search the residence for the subject of the warrant." (Doc. No. 41 ¶ 11.) The exterior of Plaintiffs' home includes "a fenced in 'dog run'" that is "located on a concrete pad with a six-food high chain link fence with two gates and measures fifteen feet long." (Id. ¶ 12.)

When law enforcement arrived at the home, Defendant approached the house from the left and was accompanied by another trooper, Trooper Drum ("Trooper Drum"). (Id. ¶ 13, Doc. No. 42-1 at 32: 25.) Defendant does not recall whether, at this time, upon entering the property, he "would have seen the dog run" or the "dog gated area" that would have been to his left. (Doc. No. 42-1 at 29: 22-25.) Defendant stated that as he approached the home, he was not looking for certain items, such as dog bowls, dog treats, or dog feces on the property. (Id. at 30: 15-25, 31: 1-3.) Defendant "did not hear any law enforcement officers say there might be a dog at the home, but did hear a noise that sounded like a door slamming shut." (Doc. No. 41 ¶ 15.)

As law enforcement was descending on the home, Jeffrey Bletz "had let Ace out a door at the back of the garage to [] eliminate." (Id. ¶ 16.) Defendant then saw Ace, who, according to Defendant, was "[w]ithin arm's reach of [him]" and "kind of mid-leap." (Doc. No. 42-1 at 33: 18-19.) Defendant described Ace's initial movement as "already kind of like mid-leap, mid-stride within arm's reach of [him]," adding that Ace was jumping toward him (id. at 34: 11-21),

and that Ace jumped to approximately the same level as his chest (id. at 38: 10-12). Trooper Drum stated that as Ace moved toward Defendant, Defendant "had drawn" his firearm, which he fired when Ace was at the base of Defendant's feet. (Doc. No. 47.)[3] According to Defendant, during this encounter, "Ace did not bark, but snarled – a low-pitched growling between a growl and a bark" (Doc. No. 41 ¶ 18), and Defendant believed that Ace was going to attack him (id. ¶ 19). At this point, Defendant "fired a shot with his firearm" (id. ¶ 20), and "backpedaled away from Ace" (id. ¶ 21).

After Defendant fired the first shot, which did not strike Ace, Defendant observed Ace circling around him (id. ¶ 22), while the parties dispute the manner in which Ace was facing Defendant.[4] Defendant testified that Ace "had an aggressive posture with shoulders squared off to [Defendant] and had its mouth open, front teeth visible, and was looking right at him." (Id. ¶ 23.) At this point, Defendant considered Ace as posing an imminent threat of serious bodily injury to him (id. ¶ 24), and stated that Ace "snarled another low 'growl snarl' again" and maintained an aggressive stance before Defendant fired a second and third shot with his firearm (id. ¶¶ 25, 26). The parties dispute the distance between Ace and Defendant during this portion of the encounter. (Id. ¶ 27, Doc. No. 44 ¶ 27.)[5] Following the third shot from Defendant's firearm, Defendant "heard a yelp or cry, and Ace traveled over by the driveway to where Jeffrey

---

[3] Both Defendant and Trooper Drum gave recorded statements to Pennsylvania State Police internal affairs, which Plaintiffs provided as exhibits in connection with the instant motion. (Doc. No. 47.)

[4] While Defendant asserts that Ace, after circling around him, turned directions and began to charge at him again, Plaintiffs state that in his recorded statement to Pennsylvania State Police, Defendant described Ace as circling around him and noted that he "tracked" Ace prior to firing the second and third shots. (Doc. Nos. 41 ¶ 22, 44 ¶ 22.)

[5] Defendant stated that "[f]rom the moment [he] first saw Ace, Ace was never more than three to five feet away from him" (Doc. No. 41 ¶ 27), while Plaintiffs refer to Trooper Drum's recorded statement, in which he purportedly said that, after he first saw Ace, Aced suddenly moved toward Defendant, who "had drawn his service weapon" (Doc. No. 44 ¶ 27).

Bletz was and laid down at his feet." (Doc. No. 41 ¶ 28.) Of the three bullets fired by

Defendant, one of them struck Ace, and, as a result, Ace was killed. (Id. ¶¶ 29, 30.)[6] None of

the Plaintiffs witnessed any of the shots fired by Defendant. (Doc. No. 41 ¶ 32.)

### B. Procedural Background

On April 29, 2016, Plaintiffs initiated the above-captioned action by filing a complaint

against Defendant in this Court, alleging violations of the Fourth and Fourteenth Amendments to

the United States Constitution by operation of 42 U.S.C. § 1983 (Count I), and intentional

infliction of emotional distress under Pennsylvania law (Count II). (Doc. No. 1.) Upon the

completion of discovery, Defendant filed the instant motion for summary judgment on both

counts (Doc. No. 40), which was fully briefed in June of 2018 (Doc. Nos. 43, 46, 55).

Accordingly, the motion is ripe for disposition.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 governs the grant of summary judgment. Parties may

move for summary judgment on particular claims or defenses, or on a part of each claim or

defense. Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Id. "Material facts are those that could affect the outcome of the proceeding,

and a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable

jury to return a verdict for the nonmoving party." Pearson v. Prison Health Serv., 850 F.3d 526,

534 (3d Cir. 2017) (citation omitted).

---

[6] Subsequent to the incident, Plaintiffs arranged for a necropsy to be performed, and have
submitted the report summarizing the findings of the necropsy in conjunction with their response
to Defendant's motion. (Doc. No. 45-2.) In responding to Defendant's statement of facts,
Plaintiffs maintain that "the [n]ecropsy definitively established that Ace was struck one time in
the right side by [Defendant's] bullet in a direction and location consistent with moving laterally
across [Defendant's] field of vision." (Doc. No. 44 at 12) (citing Doc. No. 45-2.)

In pertinent part, parties moving for, or opposing, summary judgment must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The non-moving party cannot rest on mere pleadings or allegations," El v. Se. Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007), but "must set forth specific facts showing that there is a genuine issue for trial." Saldana v. Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001). The Court "must view all evidence and draw all inferences in the light most favorable to the non-moving party" and will grant the motion only "if no reasonable juror could find for the non-movant." Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008).

## III.    DISCUSSION

### A.    Plaintiffs' Fourth Amendment Claims[7]

#### 1.    Applicable Legal Standards

##### i.    Claim Asserted Pursuant to 42 U.S.C. § 1983

---

[7] While Count I of Plaintiffs' complaint asserts a cause of action for "unlawful seizure of personal effect" in violation of the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 (Doc. No. 1 at 7), Defendant notes that "[a]ll references in Count I refer to a seizure made pursuant to the Fourth Amendment only" and states that "[t]here are no allegations that [Defendant] violated Plaintiffs' Fourteenth Amendment rights in any way, and there are no references to common terms such as due process or equal protection" in the complaint (Doc. No. 43 at 19). Plaintiffs' brief in opposition to Defendant's motion does not appear to refer to any type of Fourteenth Amendment violation. (Doc. No. 46.) Accordingly, the Court considers Count I only as alleging a Fourth Amendment violation. To the extent Plaintiffs refer to the Fourteenth Amendment for purposes of the application of the Fourth Amendment to actions on the part of a state, the Court recognizes that the Fourth Amendment applies to conduct of state officials by operation of the Fourteenth Amendment. See Mapp v. Ohio, 367 U.S. 643, 655 (1961).

Section 1983 is the vehicle by which private citizens can seek redress for violations of federal constitutional rights committed by state officials.  <u>See</u> 42 U.S.C. § 1983.  The statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

<u>Id.</u>  "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors."  <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 284-85 (2002)).  To maintain a cause of action under Section 1983, a plaintiff must demonstrate that: (1) the conduct complained of was committed by persons acting under color of state law;  and (2) the conduct violated a right, privilege, or immunity secured by the Constitution or laws of the United States.  <u>See</u> <u>Harvey v. Plains Twp. Police Dep't</u>, 421 F.3d 185, 189 (3d Cir. 2005) (quoting <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988)).

### ii.       Fourth Amendment Seizure

The Fourth Amendment to the United States Constitution provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  <u>See</u> U.S. Const. amend. IV.  For purposes of the Fourth Amendment, one's "effects" include personal property.  <u>See</u> <u>United States v. Place</u>, 462 U.S. 696, 701-02 (1983) (discussing the constitutionality of seizures of personal property).  "A Fourth Amendment 'seizure' of personal property occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'"  <u>Brown v. Muhlenberg Twp.</u>, 269 F.3d 205, 209 (3d Cir. 2001) (quoting <u>United States v. Jacobsen</u>, 466

U.S. 109, 113 (1984)). "Destroying property meaningfully interferes with an individual's possessory interest in that property." Id. at 210 (citing Jacobsen, 466 U.S. at 124-25). "Under Pennsylvania law, a dog is considered 'personal property' and thus, an 'effect' for [] purposes of the Fourth Amendment." Chappell v. Horsham Twp. Police Dep't, No. 2:16-cv-02650, 2018 WL 6075096, at *6 (E.D. Pa. Nov. 20, 2018) (citing 3 Pa. Stat. Ann. §§ 459-601(a)). The United States Court of Appeals for the Third Circuit has held that "the killing of a person's dog by a law enforcement officer constitutes a seizure under the Fourth Amendment." See Brown, 269 F.3d at 210 (citing Fuller v. Vines, 36 F.3d 65, 68 (9th Cir. 1994), overruled by Robinson v. Solano Cty., 278 F.3d 1007 (9th Cir. 2002); Lesher v. Reed, 12 F.3d 148, 150-51 (8th Cir. 1994), overruling recognized by Viilo v. Eyre, 547 F.3d 707 (7th Cir. 2008)).

"[W]hen the state claims a right to make a warrantless seizure," the Court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." See id. (quoting Place, 462 U.S. at 703). In the context of the killing of a pet by law enforcement, "[t]he state's interest in protecting life and property may be implicated when there is reason to believe the pet poses an imminent danger." See Chambers v. Doe, 453 F. Supp. 2d 858, 867 (D. Del. 2006) (citing Brown, 269 F.3d at 210). "When an animal poses an imminent danger, the state's interest may even justify the extreme intrusion occasioned by the destruction of the pet in the owner's presence, and could be found to be reasonable within the meaning of the Fourth Amendment." Id. (citing Brown, 269 F.3d at 210-11). "In judging the reasonableness of the officers' actions, the [C]ourt assesses only the reasonableness of [his] actions vis-à-vis the dog and does not consider the potential harm to third parties." Id. (citing Andrews v. City of West Branch, 454 F.3d 914, 918 (8th Cir. 2006)).

### iii.    Qualified Immunity

"Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007). "Qualified immunity 'gives ample room for mistaken judgments' by shielding 'all but the plainly incompetent or those who knowingly violate the law.'" Olson v. Ako, 724 F. App'x 160, 164 (3d Cir. 2018) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). "This accommodation recognizes [the] societal interest in law enforcement's pursuit of investigations unconstrained by the constant fear of being sued." Id. (citing Hunter v. Bryant, 502 U.S. 224, 229 (1991)). Consequently, an official is qualifiedly immune unless "the official violated a statutory or constitutional right," and "the right was 'clearly established' at the time of the challenged conduct." See Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Courts may begin their consideration with either prong." Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 637 (3d Cir. 2015) (citing Pearson v. Callahan, 555 U.S. 223, 236 (3d Cir. 2015)).

"A right is 'clearly established' for these purposes when its 'contours . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist., 877 F.3d 136, 142 (3d Cir. 2017) (alteration in original) (quoting Wilson v. Layne, 526 U.S. 603, 615 (1999)). "It is not enough that the right is defined at a high level of generality; rather, '[t]he dispositive question is whether the violative nature of particular conduct is clearly established.'" Id. (alteration in original) (internal quotation marks omitted) (quoting Mullenix v. Luna, __ U.S. __ at __ (2015)). As instructed by the United States Court of Appeals for the Third Circuit, when examining whether a constitutional right is clearly established, the Court must "look first for 'applicable Supreme

Court precedent[]'" and, if there is none, the Court "consider[s] whether there is a case of controlling authority in [its] jurisdiction or a 'robust consensus of cases of persuasive authority' in the Court of Appeals [that] could clearly establish a right for purposes of qualified immunity." See id. (fourth alteration in original) (quoting <u>Mammaro v. N.J. Div. of Child Prot. & Permanency</u>, 814 F.3d 164, 169 (3d Cir. 2016), <u>as amended</u> (Mar. 21, 2016)). "The authority need not be 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" <u>Id.</u> (quoting <u>al-Kidd</u>, 563 U.S. at 741).

## 2. Arguments of the Parties

### i. Defendant's Arguments in Favor of Summary Judgment

In support of his motion, Defendant argues that he was reasonable in shooting Ace primarily because Pennsylvania law permits a law enforcement officer "to kill any dog that constitutes a 'threat to the public health and welfare'" (Doc. No. 43 at 17) (citing 3 P.S. § 459-302(a)), and a law enforcement officer is permitted to "take the means necessary to neutralize a threat of bodily harm during the pursuit of their duties" (<u>id.</u>) (citing 18 Pa. Cons. Stat. Ann. § 508). According to Defendant, his actions "are clearly reasonable given that he was executing a warrant in the performance of his law enforcement duties when he fired three shots because he feared an imminent threat – that Ace was going to attack him and cause him . . . serious bodily injury." (<u>Id.</u>) Defendant also states that because Plaintiffs were not present during this encounter, they cannot dispute his testimony as to the relevant chain of events and, therefore, "there is no dispute of material fact" as to what occurred between Defendant and Ace. (<u>Id.</u> at 18.) In sum, Defendant argues that he acted reasonably "to protect himself in the performance of his duties" in that 'the only weapon that would be effective to halt the threat, given the amount of

time he had to decide, was his firearm" and "his purpose in firing each shot was to protect himself from an imminent threat of serious bodily injury."  (Id. at 19.)

Defendant asserts that, alternatively, he is immune from liability as to Plaintiffs' Fourth Amendment claim by operation of qualified immunity.  (Id. at 20.)  In support of this proposition, Defendant states that "[e]xisting precedent does not place beyond debate the conclusion that a reasonable trooper in [Defendant's] position could have thought that firing three shots to protect himself – from an aggressive dog that he believed was going to attack him and cause him serious bodily injury – would violate clearly established law."  (Id. at 22.) Further, Defendant states that the law, rather, permits law enforcement officers to use necessary means to combat such a threat when performing their duties.  (Id.) (citing 18 Pa. Cons. Stat. Ann. § 508).  Defendant states, therefore, that a reasonable trooper in his position "would not have believed that protecting himself from an imminent threat of serious bodily injury would violate clearly established law" and, as a result, he is entitled to qualified immunity.  (Id. at 24.)

## ii.      Plaintiffs' Arguments in Opposition to Summary Judgment

Conversely, Plaintiffs state that summary judgment is improper because Defendant is not entitled to qualified immunity where he "failed to devise[] [a] plan to handle any aggressive dog," and "fired a bullet into the right side of the family dog when the dog did not present as a threat."  (Doc. No. 46 at 3.)  Noting that the relevant inquiry in this case is "whether Ace's seizure was objectively reasonable[,]" Plaintiffs rebuff Defendant's "argu[ment] that the seizure was reasonable because of his fear of serious bodily injury" because "[t]he fact that Ace aggressively tried to attack [] Defendant is disputed" and there is evidence of record to rebut such an argument, including Defendant's own testimony and the report summarizing the findings of the necropsy.  (Id. at 4-5.)  Further, Plaintiffs note that Defendant "did not suddenly confront

an unexpected emergency situation that precluded consideration of non-lethal engagement methods[,]" but, "[r]ather, this was a routine warrant service where officers sat in a briefing, a half mile away, to plan before descending on the property." (Id. at 5.) As to qualified immunity, Plaintiffs state that qualified immunity is not applicable in this case "because the right at issue was clearly established at least as of 2001[,]" when the United States Court of Appeals issued its opinion in Brown v. Muhlenberg Township. (Id. at 6) (citing Brown, 269 F.3d at 211).

### 3.  Whether Defendant is Entitled to Summary Judgment as to Plaintiffs' Fourth Amendment Claim (Count I)

The Court concludes that Defendant is entitled to judgment as a matter of law on Plaintiffs' Fourth Amendment claim because the seizure was reasonable, and, as a result, Defendant is qualifiedly immune from liability as to this claim. At the outset, the Court recognizes that the shooting of Ace constitutes a seizure for purposes of the Fourth Amendment. See Brown, 269 F.3d at 210 ("[T]he killing of a person's dog by a law enforcement officer constitutes a seizure under the Fourth Amendment." (citing Fuller, 36 F.3d at 68; Lesher, 12 F.3d at 150-51)). Accordingly, this Court must consider whether the seizure was reasonable, or, rather, in violation of the Fourth Amendment, for Defendant is qualifiedly immune unless he violated Plaintiffs' Fourth Amendment rights and the applicable Fourth Amendment right was clearly established at the time of the incident giving rise to this case. See al-Kidd, 563 U.S. at 735 (citing Harlow, 457 U.S. at 818).

Upon review of the relevant evidence of record, the parties' arguments, and the applicable law, the Court concludes that the seizure of Ace was reasonable for purposes of the Fourth Amendment. In assessing the reasonableness of a seizure, the Court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion." See Place, 462 U.S. at

12

703.  Pursuant to this standard, this Court must "determine[] whether, under the circumstances of

record, the shooting of [Ace] by [Defendant] was reasonable[,]" and in making such a

determination, "the [C]ourt assesses only the reasonableness of [Defendant's] actions vis-à-vis

the dog and does not consider the potential harm to third parties." See Chambers, 453 F. Supp.

2d at 867-68 (citing Andrews, 454 F.3d at 918).  Accordingly, the Court recognizes the intrusion

on Plaintiffs' interest in Ace, their dog, under the Fourth Amendment, and weighs this intrusion

against Defendant's interest in personal safety during the process of executing a warrant as a law

enforcement officer.

        While the intrusion on Plaintiffs' Fourth Amendment rights is certainly severe in that Ace

was killed, the Court finds that the undisputed facts and relevant evidence of record demonstrate

Defendant acted reasonably under the circumstances.  It is undisputed that none of Plaintiffs

witnessed the encounter between Defendant and Ace (Doc. No. 41 ¶ 32), and the evidence of

record does not call into question Defendant's testimony that he believed himself to be in danger

of serious bodily injury as Ace approached him (id. ¶ 24, Doc. No. 44 ¶ 24; Doc. No. 47).  These

factors weigh in favor of a finding that Defendant acted reasonably.  See Chambers, 453 F. Supp.

2d at 868 (concluding that the facts demonstrated that the officer acted reasonably in shooting

the dog and noting that "[t]he undisputed facts, however, are that those who actually saw the dog

agree he was growling, aggressive, and advancing toward [another officer], who was attempting

to arrest [the] plaintiff").  While Plaintiffs place great weight on the necropsy conducted

following the incident and Trooper Drum's recorded statement in support of their argument that

Ace was not advancing toward Defendant in a way that required the amount of force that was

actually used by Defendant (Doc. Nos. 45-2, 46 at 4), Plaintiffs' emphasis on these portions of

the record is unavailing because, even interpreting such evidence in a light most favorable to

Plaintiffs, the non-movants, the undisputed facts of record demonstrate that Defendant shot Ace after Ace, of whom Defendant had no knowledge prior to approaching the home, approached him suddenly in what Defendant interpreted to be an aggressive manner such that his safety was potentially compromised.[8]  While the Court recognizes that it is impossible to ascertain whether Ace truly intended to attack Defendant, "at the time Defendant [] fired his gun, he had no way to know [Ace]'s true intentions[,]" but, rather, based on the evidence before the Court, knew "only that [Ace] appeared ready to strike" and if Defendant refrained from acting in that moment and Ace "acted out his hostile demeanor as he appeared ready to do, the time would have already expired for him to safely discharge his [firearm] in self-defense."  See Pettit v. New Jersey, No. 09-cv-3735, 2011 WL 1325614, at *6 (D.N.J. Mar. 30, 2011).  This consideration is highly important in the context of the execution of a warrant, where officers "are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  See Altman v. City of High Point, 330 F.3d 194, 205 (4th Cir. 2003) (quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989)).  Upon review of the relevant evidence of record, undisputed facts and applicable law, the Court finds that Defendant acted reasonably in using the one option he felt would protect himself from serious bodily injury opposite a dog whom he viewed as preparing to attack him.[9]

---

[8] The Court notes that in their response to Defendant's statement of facts, while Plaintiffs admit Defendant testified that Ace had an aggressive posture toward him, Plaintiffs also deny that Ace had an aggressive posture and state that Defendant "admitted that he has no training in dog behavior, and that he is not a canine expert[,]" and, therefore, Defendant "is not qualified to provide an expert opinion regarding whether the described posture represents aggression."  (Doc. No. 44 ¶ 23.)  Conspicuously absent from Plaintiffs' response, however, is any citation to authority for the proposition that Defendant cannot testify as to his personal impression of his interaction with Ace.  Accordingly, the Court rejects the aforementioned argument from Plaintiffs.

[9] Even if there were evidence of record to suggest that Defendant had non-lethal means readily available to him at the moment he encountered Ace, the availability of such means would not

Moreover, there is scant binding authority within this Circuit on the precise issue presented in this case that would suggest that this Court reach a contrary conclusion as to the reasonableness of the seizure.  While Court of Appeals in <u>Brown v. Muhlenberg Township</u> held that the killing of a dog by a law enforcement officer constitutes a seizure under the Fourth Amendment, <u>see</u> <u>Brown</u>, 269 F.3d at 210, the court concluded that the seizure was unreasonable under factual circumstances very different than those present in the case at bar.  In <u>Brown</u>, the officer killed the plaintiff's dog by firing five shots at the dog while one of the plaintiffs witnessed the encounter and screamed "That's my dog, don't shoot!"  <u>See id.</u> at 209 (describing factual background).  Additionally, the dog "was not stationary and not growling or barking[,]" and, according to another eyewitness, "did not display any aggressive behavior toward [the officer] and never tried to attack him."  <u>See id.</u> (relaying the account of a "stranger observing from his car").  In light of these facts, the Court of Appeals held that an unreasonable seizure may occur when an officer destroys a pet "when it poses no immediate danger and the owner is looking on, obviously desirous of retaining custody."  <u>See id.</u> at 211.  The facts at issue in the instant case are very much distinguishable from those in <u>Brown</u> because in this case, the undisputed facts and relevant evidence of record demonstrate that Defendant encountered Ace suddenly while executing a warrant, Ace behaved an in a way that Defendant interpreted as aggressive, Defendant lacked abundant time to decide how to react, and Plaintiffs did not witness the encounter or attempt to intervene.  Accordingly, in light of <u>Brown</u>'s inapposite fact pattern and limited holding, as well as the existence of other authority dictating the conclusion that Defendant acted reasonably, the Court concludes that the seizure was reasonable and, therefore,

---

alter the Court's reasonableness determination because the Court will not evaluate Defendant's actions in hindsight, in light of its task "to put itself into the shoes of the officer[] at the time the actions took place and to ask whether the actions taken by the officer[] were objectively unreasonable."  <u>See</u> <u>Altman</u>, 330 F.3d at 205.

did not violate the Fourth Amendment.[10]  The Court will, therefore, grant Defendant's motion for summary judgment as to Count I of the complaint.

**B.      Plaintiffs' State Law Claim for Intentional Infliction of Emotional Distress**

      **1.      Applicable Legal Standards**

            **i.      Intentional Infliction of Emotional Distress Under Pennsylvania Law**

Under Pennsylvania law, a claim for intentional infliction of emotional distress ("IIED") consists of the following elements: "(1) the defendant's conduct was extreme and outrageous; (2) the conduct caused the plaintiff severe emotional distress; and (3) the defendant acted intending to cause such distress or with knowledge that same was 'substantially certain' to occur."  See Dobson v. Milton Hershey Sch., No. 1:16-cv-1958, 2018 WL 6436718, at *6 (M.D. Pa. Dec. 7, 2018) (citing Brown, 269 F.3d at 217-18).   "Whether conduct could reasonably be regarded as extreme and outrageous is a threshold inquiry for the [C]ourt's determination."  Id. (citing M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist., 43 F. Supp. 3d 412, 430 (M.D. Pa. 2014)).  The Supreme Court of Pennsylvania has noted, however, that "courts have been chary to allow recovery for a claim of [IIED][,]" and "[o]nly if conduct which is extreme or clearly outrageous is established will a claim be proven."  See Hoy v. Angelone, 720 A.2d 745, 753-54 (Pa. 1998).  "Indeed . . . [t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  Id. at 754 (alteration in original) (quoting Buczek v. First Nat'l Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)).

---

[10] In light of this conclusion, the Court will not address the issue of whether the law was "clearly established" for purposes of qualified immunity.  See, e.g., Pettit, 2011 WL 1325614, at *7 (stating that because the court had determined the seizure was reasonable, it "need not determine whether the right was clearly established").

## ii.    Sovereign Immunity

Pennsylvania law recognizes the concept of sovereign immunity in certain circumstances,

providing that:

> Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity. When the General Assembly specifically waives sovereign immunity, a claim against the Commonwealth and its officials and employees shall be brought only in such manner and in such courts and in such cases as directed by the provisions of Title 42 (relating to judiciary and judicial procedure) or 62 (relating to procurement) unless otherwise specifically authorized by statute.

1 Pa. C.S.A. § 2310.  In Pennsylvania, the "sovereign immunity statute shields the

Commonwealth, its officials, and its employees acting within the scope of their duties from suit."

See Foster v. McLaughlin, 203 F. Supp. 3d 483, 488 (E.D. Pa. 2016) (citing 1 Pa. C.S.A.

§ 2310).  "[F]or practical purposes under Pennsylvania law, there are two ways to overcome

sovereign immunity."  Sarin v. Magee, 333 F. Supp. 3d 475, 481 (E.D. Pa. 2018).  "First, the

legislature has waived sovereign immunity by statute in nine specific areas."  Id. (citing Pa. C.S.

§ 8522(b)(1)); see also Ioven v. Nestel, 150 A.3d 571, 573 (Pa. Commw. Ct. 2016).[11]  If any of

these areas is inapplicable, the relevant question becomes whether the defendant was acting in

the scope of his or her employment when the acts in question occurred, as sovereign immunity

applies to "officials and employees [of the Commonwealth] acting within the scope of their

duties."  See 1 Pa. C.S.A. § 2310.

---

[11] As noted by the Commonwealth Court, "[t]he exceptions to sovereign immunity include: vehicle liability; medical-professional liability; care, custody, or control of personal property; Commonwealth real estate, highways, and sidewalks; potholes and other dangerous conditions; care, custody, or control of animals; liquor store sales; National Guard activities; and toxoids and vaccines."  See Ioven, 150 A.3d at 573 (citing 42 Pa. C.S. § 8522(b)(1)-(9)).

"Whether a state official acted within the scope of employment is a question of state law, and Pennsylvania has adopted the definition from the Restatement (Second) of Agency (1958)." Sarin, 333 F. Supp. 3d at 481 (citing Brumfield v. Sanders, 232 F.3d 376, 380 (3d Cir. 2000)). Under this approach, "a person's conduct is within the scope of employment if and only if: '(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master.'" See id. Accordingly, "state employees do not lose their immunity for intentional torts, provided they are acting within the scope of their employment." See Kull v. Guisse, 81 A.3d 148, 157 (Pa. Commw. Ct. 2013) (citing Williams v. Stickman, 917 A.2d 915 (Pa. Commw. Ct. 2007); La Frankie v. Miklich, 618 A.2d 1145 (Pa. Commw. Ct. 1992)).

### 2.    Arguments of the Parties

In support of his motion, Defendant argues that he is entitled to summary judgment on Plaintiff's claim for intentional infliction of emotional distress ("IIED") under Pennsylvania law because the IIED claim is barred by operation of the doctrine of sovereign immunity. (Doc. No. 43 at 24.) Specifically, Defendant asserts that he "is entitled to sovereign immunity because his actions, even if in violation of PSP policy, were within the scope of his employment[,]" noting that, "[a]t the time of the incident, [he] was a member of the Troop H York Barracks in the patrol unit" and "was assigned to assist with the service of a warrant with other law enforcement agencies at the Bletz home." (Id. at 26.) According to Defendant, in light of such facts, as well as the authority given to law enforcement officers under Pennsylvania law "to kill any dog that constitutes a 'threat to the public health and welfare[,]'" he "was engaged in the kind of work he was employed to perform, during authorized time and space limits, and for the purpose of serving his employer." (Id. at 27.) Additionally, Defendant states that even if Plaintiffs' IIED

claim is not precluded by sovereign immunity, the claim would fail as a matter of law because his "conduct certainly does not go beyond all possible bounds of decency" in that he was "protecting himself from an imminent threat of severe bodily injury" and, therefore, his conduct was not egregious for purposes of an IIED claim. (Id. at 29.) Defendant adds that "there is no evidence that [he] acted with the intention of inflicting emotional distress upon Plaintiffs, that he was aware that such distress would be virtually certain to occur to Plaintiffs, or that he understood his actions to be illegal but chose to take the actions anyway." (Id.) According to Defendant, therefore, he is entitled to judgment as a matter of law on Plaintiffs' IIED claim.

In opposition, Plaintiffs assert that Defendant's conduct is not protected by sovereign immunity because "[t]he intentional destruction of a family dog that posed no imminent danger and whose owners were known, cannot even arguably fall within [] Defendant's job responsibilities, and certainly is not intended to serve [Defendant's] master." (Doc. No. 46 at 8) (citing Brown, 269 F.3d at 211). Further, Plaintiffs state that in addition to the fact that sovereign immunity is inapplicable to Defendant's conduct, "the malicious killing of a pet can support a claim in Pennsylvania for the tort of [IIED]." (Id.) (citing Brown, 269 F.3d at 218; Banaszczek v. Kowalski, No. 9009 of 1978, 1979 WL 489, at *2 (C.P. Luzerne Cty. Jan. 30, 1979)). Plaintiffs maintain that consequently, granting Defendant's motion on this claim would be improper.

### 3.       Whether Defendant is Entitled to Summary Judgment as to Plaintiffs' IIED Claim (Count II)

Upon consideration of the record before the Court, the parties' arguments, and the governing law, the Court concludes that Defendant is entitled to summary judgment on Plaintiffs' IIED claim because Defendant is immune from liability by operation of the doctrine of sovereign immunity. The Court initially notes that none of the nine statutory exceptions to

sovereign immunity recognized in Pennsylvania is present here, which the parties do not dispute.

Accordingly, the Court turns to the issue of whether Defendant was acting within the scope of

his employment when the complained-of conduct took place.  See, e.g., Sarin, 333 F. Supp. 3d at

481 (noting that the claims at issue did not invoke any of the nine statutory exceptions to

sovereign immunity and stating that "[t]he question then becomes whether [the officials] were

acting within the scope of their employment when they engaged in the conduct at issue").  An

action occurs within the scope of one's employment if it:

> (1) is the kind that the employee is employed to perform; (2) occurs substantially
> within the job's authorized time and space limits; (3) is motivated at least in part
> by a desire to serve the employer; and (4) if force was used by the employee
> against another, the use of force is not unexpectable by the employer.

Mitchell v. Luckenbill, 680 F. Supp. 2d 672, 683 (M.D. Pa. 2010) (quoting Wesley v. Hollis, No.

03-cv-3130, 2007 WL 1655483, at *14 (E.D. Pa. June 6, 2007)).

In the case at bar, it is undisputed that the encounter between Defendant and Ace

occurred while Defendant was assisting other law enforcement officers in executing a warrant at

the Bletz home.  Specifically, Defendant was acting in his "capacity as [a] state trooper[]" and

"not as [a] private individual[,]" thus demonstrating that he was acting within the scope of his

employment and sovereign immunity is applicable.  See id. at 683 (concluding that sovereign

immunity applied to defendants who "were on duty, in uniform, and investigating a crime

throughout the duration of the alleged offenses").[12]  Accordingly, the Court concludes that

---

[12] Further, to the extent Plaintiffs assert that Defendant's actions amount to willful misconduct,
any such argument does not change the Court's conclusion herein as to sovereign immunity
because willful misconduct does not negate the applicability of sovereign immunity.  See, e.g.,
Brautigam v. Fraley, 684 F. Supp. 2d 589, 594 (M.D. Pa. 2010) ("[D]espite the fact that the
claims alleged by [the] [p]laintiffs might amount to willful misconduct, [the] [d]efendants are
still within the umbrella of immunity provided by 1 Pa. Cons. Stat. Ann. § 2310."); see also
Mitchell, 680 F. Supp. 2d at 682 ("[W]illful misconduct does not vitiate a Commonwealth
employee's immunity if the employee is acting within the scope of his employment, including

Defendant is entitled to judgment as a matter of law on Plaintiffs' IIED claim by operation of sovereign immunity, and will grant Defendant's motion for summary judgment as to Count II of the complaint.

## IV.     CONCLUSION

For the reasons stated herein, the Court will grant Defendant's motion in its entirety. (Doc. No. 40.)  An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

---

intentional acts which cause emotional distress." (alteration in original) (quoting <u>Cooper v. Beard</u>, No. 06-cv-171, 2006 WL 3208783, at *16 (E.D. Pa. Nov. 2, 2006))).